# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. NATHANIEL MACLIN

**Appeal from the Criminal Court for Shelby County**
**No. 11-04525      Lee V. Coffee, Judge**

_____

### No. W2013-00967-CCA-R3-CD  - Filed June 6, 2014

_____

The defendant, Nathaniel Maclin, appeals his Shelby County Criminal Court jury conviction of sexual battery by an authority figure, challenging the sufficiency of the convicting evidence.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Juni S. Ganguli (on appeal) and Leslie Ballin and Benjamin Katz (at trial), Memphis, Tennessee, for the appellant, Nathaniel Maclin.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Shelby County Criminal Court grand jury charged the defendant with one count of sexual battery by an authority figure against the victim, K.W.[1]  The trial court conducted a jury trial in January 2013.

V.T.E.,[2] the victim's aunt on her mother's side, testified that she and her husband had custody of the victim and that they had previously been awarded custody of the

_____

[1]As is the policy of the court, we refer to the minor victim by her initials.

[2]To protect the anonymity of the minor victim, we refer to her adult relatives by their initials.

victim when she was three years of age due to the victim's unstable home environment. V.T.E. testified that her sister, C.W., had 12 children and that, over the years, V.T.E. had obtained custody of nine of the children, including the victim. V.T.E. stated that C.W. had not raised any of her children, testifying that C.W. had battled substance abuse problems and had been arrested many times for both drugs and prostitution.

In December 2010, the victim resumed living with her mother, C.W.; C.W.'s boyfriend, the defendant, lived there as well. At the time the victim moved in with them, V.T.E. believed that the defendant "was a pretty decent man" and noted that he treated the victim "as a daughter, nothing else." V.T.E. testified that the defendant worked as a security guard and was a "great provider" for C.W. and the victim. In late 2011, V.T.E. regained custody of the victim.

The victim testified that she was 15 years old and that she had lived with V.T.E. since the age of three. The victim explained that, at the age of 13, she went to live with C.W. because C.W. had just been released from jail, and the victim "wanted to see what it [felt] like to live with my real mother." Sometime after moving in, the victim learned that the defendant paid the rent on their apartment. The victim was happy at first and recalled that the defendant treated her well.

On February 17, 2011, the victim was in the apartment she shared with her mother and the defendant. The victim testified that her mother had undergone a dental procedure that morning, and that, in the evening, her mother had fallen asleep in her bedroom while watching television. The victim, who had been watching television in the living room, retired to her own bedroom at 8:30 p.m. to go to bed. Sometime later, the defendant entered the victim's bedroom, woke up the victim, and demanded that she accompany him to the living room to watch a "scary movie" with him.

When the victim entered the living room, she sat on "the long couch," and the defendant sat on a separate sofa. The defendant later moved to the sofa on which the victim was seated, and he moved closer and closer to her until he finally grabbed her wrists, forced her onto her back, and climbed on top of her. At that point, the defendant "started to grind" his body against the victim's. The defendant exposed his penis, continued to grind against the victim's groin area, and ejaculated on the victim's black jogging pants. The victim testified that the defendant was moaning throughout the assault. She recalled that the defendant touched her buttocks and kissed her with "[h]is tongue . . . in [her] mouth."

After the defendant ejaculated, he instructed the victim to wash her pants. The victim went into the bathroom, closed the door, and turned on the water faucet, but she did not wash her pants. The victim hid the black pants in her bedroom and put on a different pair

of pants before returning to the living room. The defendant grabbed the victim's wrist and forced her to sit beside him on the sofa. The victim's mother then walked into the living room, and the defendant "ran to the other couch." The victim immediately informed her mother of what the defendant had done to her, at which point C.W. contacted the police, and the defendant left the apartment. When police officers arrived, the victim told them everything that had happened and gave her black pants to the officers.

On cross-examination, the victim acknowledged that, during the time that she lived with her mother and the defendant, the defendant never assigned her a curfew, told her what clothing to wear, or told her with whom she could associate.

On re-direct examination, the victim testified that the defendant "sometimes" drove her to school, that the defendant paid the rent on their apartment, that the defendant provided food and clothing for the victim and her mother, and that the defendant cared for the family dog. When the victim informed her mother of what the defendant had done to her on February 17, the defendant was standing behind C.W., waving his hands at the victim in an attempt to prevent her from telling her mother about the assault.

Memphis Police Department ("MPD") Officer Joseph Matthew Cunningham responded to a criminal assault call at the apartment the victim shared with the defendant and C.W. When Officer Cunningham arrived, he spoke with the victim, who "seemed scared" and was "really withdrawn" at first but gradually relaxed and told Officer Cunningham what had happened:

> She said that – that her mother's boyfriend had woken her up and brought her into the living room, and at that point, he had started fondling both her breasts and buttocks and tried to kiss her on the mouth. Actually, did kiss her on the mouth. Held her down on the sofa by her wrists and wouldn't let her get up, and then – and then at some point, he had ejaculated on her pants. And the boyfriend had told her to go wash the pants after it was over, which she feigned doing. She went into the bathroom, turned the water on in the sink but didn't actually wash the pants and hid them.

The victim then brought the pair of pants to Officer Cunningham, and he turned the pants over to the crime scene investigator.

MPD Officer Tim Monistere testified that he was with the crime scene unit and that he was called to the defendant's apartment on February 17. After speaking with Officer

-3-

Cunningham, Officer Monistere used an alternate light source to search for evidence of bodily fluids. Using the light source, Officer Monistere discovered a glowing area on the lid of the kitchen trash can and on a small piece of white tissue inside the trash can. Officer Monistere placed the victim's black pants and other relevant items inside evidence bags.

On cross-examination, Officer Monistere acknowledged that the alternate light source was simply a preliminary test to assist in determining which evidentiary items needed to be collected.

Special Agent and Forensic Scientist Donna Nelson with the Tennessee Bureau of Investigation ("TBI") testified as an expert in the fields of serology and deoxyribonucleic acid ("DNA") analysis. Agent Nelson testified that she tested the victim's black pants and, comparing the stain on the pants to a DNA sample from the defendant, Agent Nelson determined that the semen stain on the victim's pants matched the defendant's DNA profile. Agent Nelson stated that "[t]he probability of an unrelated individual having the same DNA profile from either the African American, Caucasian, Southeastern Hispanic or Southwestern Hispanic populations exceeds the current world population."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant chose not to testify or offer any proof.

Based on this evidence, the jury convicted the defendant as charged of sexual battery by an authority figure. Following a sentencing hearing, the trial court imposed a six-year sentence.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends only that the evidence adduced at trial was insufficient to establish his position as an authority figure; the defendant does not dispute the sufficiency of the evidence relative to his commission of sexual battery against the victim.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Sexual battery by an authority figure, as charged in this case, "is unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age" and "[t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." T.C.A. § 39-13-527(a). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Finally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Here, the proof adduced at trial established that the then-13-year-old victim lived with the defendant and her mother in an apartment paid for by the defendant. The defendant provided food and clothing for the victim and her mother, cared for the family dog, and occasionally drove the victim to school. On the evening of February 17, 2011, the defendant entered the victim's bedroom, woke her, and demanded that she watch a "scary movie" with him in the living room. While the victim was seated on the living room sofa, the defendant suddenly grabbed her wrists, pinned her to the sofa, and climbed on top of her, grinding his exposed penis against the victim's groin area until he ejaculated on the victim's pants. The defendant also touched the victim's buttocks and kissed her with "[h]is tongue . . . in [her] mouth." DNA testing of the semen stain on the victim's pants positively identified the defendant as the DNA contributor.

Affording the State the strongest legitimate view of the evidence, we conclude that the evidence supports the defendant's conviction of sexual battery by an authority figure. The defendant was the victim's mother's live-in boyfriend, and the defendant paid the rent on the apartment in which the victim and her mother resided. The defendant provided for the victim, her mother, and their dog, and drove the victim to school on occasion. Although the defendant did not impose a curfew on the victim or instruct her on the clothing she wore or the friends she could have, the evidence shows that the victim's relationship with the

defendant was similar to that of a stepfather and stepdaughter. This court has previously held that a finding of parental or custodial authority is not contingent upon the defendant's being the biological parent or legal custodian of the victim. *See State v. Terry Fossett*, No. W2012-00885-CCA-R3-CD, slip op. at 9-10 (Tenn. Crim. App., Jackson, June 5, 2013), *perm. app. denied* (Tenn. Oct. 25, 2013) (holding evidence sufficient to sustain conviction of statutory rape by an authority figure where defendant was the boyfriend of the victim's aunt, who had custody of the victim, and, *inter alia*, defendant had keys to victim's residence and "acted like a father" to the victim); *State v. Robert M. Deunes-Cruz*, No. M2011-00879-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Nashville, Jan. 7, 2013), *perm. app. denied* (Tenn. June 12, 2013) (finding evidence sufficient to sustain conviction of statutory rape by an authority figure where defendant was victim's stepfather). As such, we hold the evidence is sufficient to sustain the defendant's conviction.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE